The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FIFTEEN TWENTY-ONE SECOND AVENUE
CONDOMINIUM ASSOCIATION,

     Plaintiff,

v.

VIRACON LLC, *et al.*,

     Defendants.

NO. 23-cv-1999-BJR

**ORDER RE PENDING MOTIONS**

## I.   INTRODUCTION

This lawsuit concerns the 38-story building located at 1521 Second Avenue in Seattle, Washington, ("the Building") which is owned by Plaintiff Fifteen Twenty-One Second Avenue Condominium Association ("the Association"). The Association claims that the double-paned Insulated Glass Units ("IGUs") that make up the exterior curtain wall of the building were defectively designed and constructed. The Association asserts multiple state-law claims against various entities involved in the IGUs' manufacture, marketing, and distribution. Currently pending before the Court are Defendants' Joint Motion for Summary Judgment, ECF No. 178, Plaintiff's Motion for Summary Adjudication, ECF No. 186, and multiple related motions, including Defendants' motion for sanctions for spoliation, ECF No. 175, and motions to strike, ECF Nos.

ORDER RE PENDING MOTIONS

- 1

224, 270, 274, and a request for judicial notice, ECF No. 234. Also pending are six motions to exclude experts pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). *See* ECF Nos. 256, 258, 261, 263, 265, 268.

Having reviewed the materials[1] and the relevant legal authorities, the Court will grant Defendants' motion for summary judgment on all claims as time-barred.

## II.    BACKGROUND

### A.    The Parties

Plaintiff, Fifteen Twenty-One Second Avenue Condominium Association (the "Association"), is composed of owners of the residential and commercial units of the 38-story building located at 1521 Second Avenue in Seattle, Washington. Am. Compl. ¶ 12. The luxury condominium building was completed in December 2008 and features a high-performance glass curtain wall. *See* Pl.'s MSJ, Gonzalez Ex.1 ("WJE Expert Rpt."), ECF No. 187-1 (referencing the architect's website:  https://www.weberthompson.com/project/1521-second-avenue/ (last visited 2/24/2026).

---

[1] Including Defendants' motion for summary judgment ("Defs.' MSJ"), ECF No. 178); Plaintiff's response in opposition ("Pl.'s Opp'n"), ECF No. 204); Defendants' reply ("Defs.' Reply"), ECF No. 229); Plaintiff's motion for partial summary judgment ("Pl.'s MSJ"), ECF No. 186; Defendants' response in opposition ("Defs.' Opp'n"), ECF No. 195; Plaintiff's reply ("Pl.'s Reply"), ECF No. 232; Plaintiff's evidentiary objections, ECF No. 214; Plaintiff's request for judicial notice, ECF No. 234; Defendants' response in opposition to judicial notice, ECF No. 241; Plaintiff's reply re judicial notice, ECF No. 245; Defendants' motion for sanctions ("Defs.' Mot. Sanctions"), ECF No. 175; Plaintiff's response in opposition to sanctions, ("Pl.'s Opp'n Sanctions"), ECF No. 193; Plaintiff's evidentiary objections re sanctions ("Pl.'s Evid. Obj. Sanctions"), ECF No. 194; Defendants' reply re sanctions ("Defs.' Reply Sanctions"), ECF No. 229; Defendants' motion to strike Plaintiff's evidentiary objections ("Defs.' Mot. Strike"), ECF No. 224; Plaintiff's response in opposition to strike ("Pl.'s Opp'n Strike"), ECF No. 244; Defendants' motion to strike supplemental expert report of Joshua Guilliams and for spoliation sanctions ("Mot. Strike Guilliams"), ECF No. 270; Plaintiff's opposition to motion to strike Guilliams ("Pl.'s Opp'n Strike Guilliams"), ECF No. 291; Defendants' reply re strike Guilliams ("Defs.' Reply Strike Guilliams"), ECF No. 296; Defendants' motion to strike Louis Mark declaration ("Defs.' Mot. Strike Mark"), ECF No. 274; Plaintiff's response in opposition to motion to strike Mark ("Pl.'s Opp'n Strike Mark"), ECF No. 306; Defendants' reply re strike Mark ("Defs.' Reply Strike Mark"), ECF No. 308; together with supplemental briefs, multiple declarations, and hundreds of poorly organized and referenced exhibits comprising thousands of pages. The Court did not review the *Daubert* motions.

Defendant, Viracon, LLC, a wholly owned subsidiary of Apogee Enterprises, Inc.,[2] is a manufacturer of architectural glass products. Am. Compl. ¶ 6. Defendant, Quanex IG Systems, Inc., is a building products manufacturer and supplier to Viracon. *Id.* ¶¶ 8, 14. Both Viracon and Quanex supplied products that were used in building 1521 Second Avenue in Seattle, Washington. *Id.* ¶ 14. Defendant, Insulating Glass Certification Council, Inc. ("IGCC"), is a trade association that certifies products for manufacturers such as Viracon and Quanex. *Id.* ¶¶ 9, 17-19.

**B.    The Building Curtain Wall System**

"The Fifteen Twenty-One Second Avenue building is encased in a curtain wall comprised of Insulated Glass Units (IGUs) that are environmentally controlled, double-paned windows, hermetically sealed, and act as both a window and exterior wall." Am. Compl. ¶ 12. IGUs are a structural component of the building curtain wall system made up of two pieces (referred to as panes or lites) of glass. *Id.* at ¶¶ 12, 15; Pl.'s MSJ, Gonzalez Decl. Ex. 2 ("Duffner Engineering Rpt.") Fig. 4, ECF No. 187-2. As seen in the below figure, the two panes of glass are separated by a metal spacer bar, and the airspace is filled with a noble gas such as argon, which is sealed with a polyisobutylene ("PIB") primary sealant, and structurally sealed with silicone. *Id.*; Pl.'s MSJ, Gonzalez Decl. Ex. 16 ("Vitro Architectural Glass Technical Document"), ECF No. 187-16.

---

[2] Apogee was dismissed from this lawsuit for lack of personal jurisdiction. ECF No. 97.

- 3

Figure 4.  Cross section of a typical IGU showing the relative positions of the two glass panes, the metal spacer bar, the primary sealant and the secondary sealant.

Duffner Engineering Rpt. Fig. 4 (with additional annotations); *see also* Glass Tech. Doc. 5, Pl.'s Ex. 16, ECF No. 187-16 (Figure 2, Typical Dual Seal IG Unit Edge Construction).

Viracon's customer with respect to the 1521 Second Avenue building was Advanced Glazing Systems, LLC ("AGS"), which placed purchase orders and signed the written order confirmations identifying, among other things, the size, makeup, and number of IGUs to be manufactured by Viracon. Defs.' MSJ, Henson Decl. ¶ 3, ECF No. 180; Exs. 1-8, ECF Nos. 180-1 to 180-8. IGUs varied in size, glass transparency (vision or spandrel),[3] safety glazing, tempered or heat-strengthened, and operability. Defs.' MSJ Ex. 14 ("Project Manual"), ECF No. 179-14.

An IGU may fail for various reasons including physical damage to the glass or a broken seal, as well as due to a defect in manufacturing or design, and such failure requires repair or replacement of the unit. *See, e.g.*, RDH Nov. 2016 Rpt., Gonzalez Decl. Ex. 37, ECF No. 187-37 (discussing possible reasons for a broken IGU); DeWitt Dep. 30-33, Gonzalez Decl. Ex. 36, ECF

---

[3] Vision refers to glass you can see through, whereas spandrel units are opaque, usually covering a wall.

- 4

No. 187-36 (describing issues with IGUs); Ringenberg's Window Issues Master List, Ekman Decl. Ex. 17, ECF No. 179-17 (listing window repair and replacement requirements at the Building).

### C.    Factual Overview[4]

In 2002, Viracon added a gray color alternate for the primary and secondary sealant in their IGUs. Defs.' MSJ 15-16; Kent Email, Gonzalez Decl. Ex. 7; Shah Rpt. 10, Gonzalez Decl. Ex. 10. In 2007, AGS began ordering IGUs for the Building with the gray sealant. Defs.' MSJ 7; AGS Orders & Correspondence, Henson Decl. Ex. 2. The Building was completed in December 2008. WJE Expert Rpt. 3, Gonzalez Decl. Ex. 1. By 2012, the Association identified various construction defects (including curtain wall and IGU defects) and sued the Building's project developer and various subcontractors, including AGS.  Defs.' MSJ 7 (citing King County Case #12-2-24075-2 SEA, King County Case #13-2-19541-1 SEA); List of Construction Defects, Ekman Decl. Ex. 15.

In February 2014, RDH Building Sciences Inc.[5] was engaged by the Association to undertake an investigation of issues in the Building's enclosure and curtain wall system and develop a plan for repairs. RDH Proposal, Ekman Decl. Ex. 16. To help facilitate this effort, the Building Manager, Jerry Ringenberg, maintained a spreadsheet list of IGU issues. Ringenberg Dep. 39-40, Ekman Decl. Ex. 5; Ringenberg's Window Issues Master List, Ekman Decl. Ex. 17. On July 6, 2016, an IGU on the 35th floor of the Building spontaneously shattered and fell to the ground, raising safety concerns, and RDH was asked to conduct a study of the failed unit. RDH Nov. 2016 Rpt., Gonzalez Decl. Ex. 37; RDH Feb. 2017 Rpt., Ekman Decl. Ex. 27. RDH completed an

---

[4] An overview is provided here for context. Additional factual details are included below as relevant to the issues under discussion.

[5] RDH was familiar with the Building having acted as an expert for the defendant in the 2012 litigation involving the project developer and various subcontractors. Defs.' MSJ 7 (citing King County Case #12-2-24075-2 SEA, King County Case #13-2-19541-1 SEA); RDH Dep. 14-16, Ekman Decl. Ex. 1.

investigation of the recovered broken components and curtain wall design documents to identify the cause of the breakage. RDH Feb. 2017 Rpt. 1. RDH identified multiple possible causes for the breakage, designating nickel sulfide inclusion as the most likely, but noted that no definitive cause could be determined. *Id.* at 1, 5. RDH also listed some IGUs that did not meet code safety requirements and recommended that a "100% review of all IGUs be conducted" and provided some options to lower the likelihood of future spontaneous breakage. *Id.* at 5-6; RDH Feb. 2017 Proposal, Ekman Decl. Ex. 29.

A July 2017 failure of an IGU in Parking Level 4 and a September 2017 failure of an IGU on the 27th floor were also determined to be consistent with "tempered glass breakage due to nickel-sulfide inclusion." Aug. 2017 Board Mtg. Agenda 2, Ekman Decl. Ex. 30; Sep. 2017 Board Mtg. Agenda 3, Ekman Decl. Ex. 31. Additionally, an IGU on the 22nd floor shattered in December 2017 and on the 9th floor in July 2022 with no conclusive cause determined, but Jeremy DeWitt of RDH testified that it was consistent with nickel sulfide inclusion. Answer to Interrog. 7, Ekman Decl. Ex. 21; RDH Dep. 184, Ekman Decl. Ex. 1; *but see* Ringenberg Dep. 108-09, Ekman Decl. Ex. 5 (noting that the break may have been caused by a bullet); Farrell Email Jul. 2022, Ekman Decl. Ex. 32 (attaching photos of broken IGU on 9th floor).[6]

In July 2021, Seattle experienced a "heat dome" with temperatures over 100 degrees Fahrenheit over multiple days. Pl.'s MSJ 5; Justen Dep. 174-75, Gonzales Decl. Ex. 27; Maurer Dep. 21, Gonzales Decl. Ex. 28. Although there had been some observations of sealant issues prior to that time, after the "heat dome," Building residents began to complain about unsightly dripping

---

[6] The Court also notes that the "List of Known Construction Defects" provided in the King County litigation in 2012 included "a shattered operable window in unit solarium" on the 38th floor. List of Construction Defects 3, Ekman Decl. Ex. 15.

or running of sealant down the inside of their windows. Justen Dep. 175-77, Gonzales Decl. Ex. 27; Maurer Dep. 21, Gonzales Decl. Ex. 28; *see* RDH Dec. 2021 Rpt. 1, Gonzales Decl. Ex. 30 ("reporting starting approximately in 2019"); RDH Dep. 52-53, Ekman Decl. Ex. 1 (discussing taking a photograph in February 2016 of a window with migrating sealant as a potential issue). On August 31, 2021, the Building Engineer, Tom Farrell, emailed RDH a representative photograph of the dripping sealant, asking for RDH's expertise and advice regarding the "IGU butyl drippage" they were seeing and had noted "over the past couple years." Farrell Aug. 2021 Email, Ekman Decl. Ex. 25.[7] About 45-50 windows with these issues were replaced due to the dripping sealant issue. *See id.* (indicating a count of 45 affected units but noting that some had previously been replaced); Maurer Dep. 61, Gonzales Decl. Ex. 28 (indicating about 50 windows were replaced); RDH Dec. 2021 Ltr., Gonzales Decl. Ex. 30 ("We understand that a survey performed by WIS found 45 affected IGUs."[8]); Ekman Decl. Ex. 26 (same, and includes related email correspondence).

On December 6, 2021, RDH emailed a letter to the Building Manager, Jerry Ringenberg, regarding its review of the IGU sealing issues. RDH Dec. 2021 Ltr., Gonzales Decl. Ex. 30; Ekman Decl. Ex. 26. RDH provided a description of the primary and secondary sealants in a typical IGU and reported that it observed PIB migrations (also referred to as drips or creep) in 23 IGUs in a section of the Building curtain wall. *Id.* at 2. RDH indicated that "PIB migration may be caused by a number of things," noting that migration of more than 1/8-1/2 inch was considered unacceptable.

---

[7] The Association alleges that the Board immediately initiated an investigation after the complaints began in the summer of 2021 and hired RDH. Pl.'s MSJ 5 (citing Board Meeting Minutes, Gonzales Decl. Ex. 29). However, the Court notes that the referenced meeting took place in August 2022 and there is no mention of any investigation being initiated or reported upon. There was a mention under 2022 facility projects of "Window replacements from the Heat Dome damage of 2021"). *Id.* The Court did not find any evidence of an investigation being initiated other than the Building Engineer's email to RDH. From the email exchange, it appears that RDH submitted a proposal in September 2021 to review the IGU butyl drippage issue, and it was approved in October. *See* RDH Dec. 2021 Ltr., Ekman Decl. Ex. 26.

[8] WIS refers to Window Installation Specialists, Inc. *See* Order Confirmation Mar. 2019, Ekman Decl. Ex 28.

*Id.* at 3. RDH also referred to research published by the engineering consulting firm of Wiss Janney Estner ("WJE") observing that "problems with PIB can result 'solely or primarily from normal exposure to sunlight' UV radiation, and/or heat," and "the problems with PIB have occurred in only gray-colored PIB, similar to the PIB at [the Building]." *Id.* (quoting a WJE report from 2016). RDH listed other possible causes for the PIB migration, stated that there was no known remediation other than IGU replacement, recommended replacement of all the IGUs exhibiting PIB migration, and noted that "[f]urther laboratory analysis is needed to verify the cause of the observed migration and result on the structural integrity of the edge seal." *Id.*

Subsequent analysis by experts hired by the Association has led to the opinion that the IGUs suffer from a design defect related to the use of JS-780 Gray specified by Quanex IG Systems and Manufactured by TruSeal Technologies, which is alleged to be unstable and results in the loss of insulating performance and increased stress to the glass panes. Duffner Engineering Rpt., Gonzales Decl. Ex. 2; Ekman Decl. 179-13; *see also* WJE Expert Rpt. 8-9, Gonzales Decl. Ex. 1 (opining that the gray PIB "consistent with Quanex JS-780" lacks sufficient stabilizers, which leads to degradation of the PIB and is "progressive, permanent and irreversible").

### D.    Procedural Posture

The Association filed its original Complaint on December 5, 2023, in King County Superior Court, and Defendants timely removed the case to this Court. Removal Notice, ECF No. 1. The operative complaint was filed in January 2024 asserting six causes of action. Am. Compl., ECF No. 27. After the Court's rulings on motions to dismiss, four causes of action remain: (1) Count I – Civil Conspiracy to Violate, and Violation of, the Washington Consumer Protection Act ("WCPA") (against all Defendants); (2) Count II –  Violation of the WCPA (against Viracon); (3) Count III –

Fraud (against Viracon); and (4) Count VI – Violation of the Washington Product Liability Act ("WPLA") (against Viracon).

Both parties have since filed multiple motions that are now pending resolution, including cross-motions for summary judgment. Defendants jointly move for summary judgment on Plaintiff's Count I (conspiracy) and Count II (a violation of the WCPA), and Viracon separately moves for summary judgment on Plaintiff's two remaining claims directed at it (Count III fraud and Count VI violation of the WPLA). Defs.' MSJ. Plaintiff moves for partial summary judgment on four issues and affirmative defenses. Pl.'s MSJ.

### III. LEGAL STANDARD

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)); Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion." *Id.* If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most

favorable to the other. *See* Fed. R. Civ. P. 56; *see also Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (noting the court's responsibility to determine whether disputed issues of material fact are present). The Court is not obligated, however, to "organize its discussion of the cross-motions into separate sections," provided it considers the evidence, authority, and arguments provided by both sides, and rules "on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citations omitted).

## IV.   DISCUSSION

Defendants claim that they are entitled to summary judgment because the Association's claims are time-barred. Defs.' MSJ 2. Defendants also contend that the Association lacks evidence to support any of its claims.*Id.* The Association asserts that it discovered both the harm and the cause, that being the defective gray primary sealant, no earlier than December 6, 2021, when RDH advised it of the problem, its scope, and its cause, and therefore, all its claims are within the relevant statutes of limitation. Pl.'s MSJ 1. As the statute of limitations issue may be dispositive of one or more of the Association's claims, the Court will address the limitations issue before addressing the merits of the Association's claims.

### A.   The Association's request for judicial notice

As a preliminary matter, the Court must first address the Association's request for judicial notice of various public documents, ECF No. 234, which Defendants oppose, ECF No. 241. Because the determination of which materials are properly before the Court necessarily shapes the

scope of the factual record, this request must be resolved prior to evaluating the substantive merits of the underlying motions.

The Association seeks judicial notice of eleven[9] online publications offered in support of its reply to Defendants' opposition to the Association's motion for summary judgment. ECF No. 234. These publications include the following:

- Vitro Architectural Glass, Technical Document TD-126, *Argonomics of Insulating Glass Units*, Ex. A. This publication was also filed separately as an exhibit in support of Plaintiff's motion for summary adjudication. *See* Gonzalez Decl., Ex. 16, ECF No. 187-16.

- Green Building Advisor, *The Curious Case of the Imploding Windows*, Ex. B.

- Nordic Inspections, *What is a Collapsed Glass on a Window? How Does It Happen and How Can You Fix It?*, Ex. C.

- Buildings, Volume 13, Article 551, *Degradation of Insulating Glass Units: Thermal Performance, Measurements and Energy Impacts*, Ex. D.

- BuildingGreen, *High Elevation Problems Jeopardize Gas-Fill Windows*, Ex. E.

- International Association of Certified Home Inspectors, *Window Gas Fills: What Inspectors and Consumers Should Know*, Ex. F.

- The Construction Specifier, *Breaking it down: Keys to diagnosing glass breakage in buildings*, Ex. G.

- RDH Building Engineering LTD., *Glazing Failures and Ways to Prevent Them*, Ex. H.

- Glass Performance Days, *Sustainable Glass Facades: Understanding the Long-Term Thermal Performance of IGUs*, Ex. I.

- National Glass Association with Gana, *Performance Improvements in Insulating Glass Units: Cavity Gap and Insulating Gases*, Ex. J.

---

[9] The document requesting judicial notice lists eleven publications, but an additional referenced "Exhibit D" was filed at ECF No. 235. The additional exhibit, however, appears to be a duplicate of the initially referenced Exhibit D at ECF No. 234-4.

- 11

- Glass on Web, *How to detect Gas Leakage in Insulating Glass Unit with Sparklike devices*, Ex. K.

The Association asserts that these are "articles published by industry trade groups, industry publications, relevant industry experts, and a leading producer of architectural glass products on their respective publicly accessible websites and thus are from reliable sources whose accuracy and authenticity are not subject to dispute." ECF No. 234 at 2 (citing cases). The Association references the publications as proof that Viracon had repeated indications "for decades" that a warning should have been issued on the defective gray PIB. Pl.'s Reply 12. Defendants oppose the Association's request, stating that the Association is relying on the "content" of the publications, which is inadmissible hearsay. ECF No. 241 at 2-3.

The Court takes judicial notice of the existence of the publications, and their date of publication, but not as to the truth of their contents. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." (citations omitted)).

**B.    The Association's claims are time-barred**

The Association's claims arise from alleged defects in the Building's curtainwall IGUs, namely that the gray primary sealant migrates or leaks in between the lites of glass, which is unsightly, reduces insulating properties, and can cause spontaneous breakage of the individual lites of glass in the IGU. Am. Compl. ¶¶ 15, 55, 56. Examples in the record of these defects occurred as early as February and July 2016, i.e., a shattered IGU on the 35th floor on July 6, 2016, and RDH's

February 4, 2016 photograph of a window with migrating sealant noted as a potential issue. Because these events occurred more than seven years prior to the commencement of this action on December 5, 2023, the Association's claims are barred as a matter of law unless an exception to the statute of limitations applies.

### 1.    The relevant statutes of limitation

"Where a plaintiff includes multiple causes of action in a complaint, each cause of action must be evaluated under its own statute of limitations." *Asuncion v. City of Seattle*, 151 Wn. App. 1015 (2009) (citing *Wallace v. Lewis Cnty.*, 134 Wn. App. 1, 13 (2006)). The Association's claim under the Washington Product Liability Act ("WPLA") must be brought within three years "from the time the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause." RCW § 7.72.060 (3). The three-year statute of limitations also applies to the Association's claim for fraud. RCW § 4.16.080(4). Under the Washington Consumer Protection Act ("WCPA"), a four-year statute of limitations applies to all claims, including those for conspiracy. RCW §§ 19.86.090, 19.86.120; *see State v. LG Elecs., Inc.*, 186 Wn.2d 1, 8 (2016) (en banc) ("The CPA's statute of limitations provision bars 'claim[s] for damages under RCW 19.86.090' if not commenced within four years."). Since the lawsuit was filed on December 5, 2023, the WCPA claims are time-barred if they accrued prior to December 5, 2019 (four years earlier) and the WPLA and fraud claims are time-barred if they accrued prior to December 5, 2020 (three years earlier).

### 2.    Accrual and the discovery rule

The statute of limitations time clock does not begin to run until a cause of action accrues. RCW 4.16.005. The general rule of accrual in Washington is that the clock begins to run on the

date the incident occurred or "when the plaintiff can establish each element of the action." *Shepard v. Holmes*, 185 Wn. App. 730, 739 (2014) (quoting *Hudson v. Condon*, 101 Wn. App. 866, 874 (2000)). The discovery rule is an exception to the general rule and is applied to claims where "injured parties do not, or cannot, know they have been injured." *Id.* (quoting *In re Estates of Hibbard*, 118 Wn. 2d 737, 744–45 (1992)). Under the discovery rule, when it is applicable, a cause of action does not begin to accrue until the plaintiff knew or should have known the essential facts which give rise to the cause of action. *Green v. Am. Pharm. Co.*, 136 Wn.2d 87, 95 (1998).

The Supreme Court of Washington has interpreted the WPLA as incorporating the "discovery rule." *North Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wn. 2d 315, 319 (1988). This means the action accrues (or the three-year clock starts running) when the Association "know[s] or should with due diligence know that the cause in fact was an alleged defect." *Id.*; *See Green*, 136 Wn.2d at 95 ("[A] cause of action may accrue for purposes of the statute of limitations if a party should have discovered salient facts regarding a claim."). Similarly, the Association's WCPA and fraud claims incorporate the discovery rule. *See, e.g.*, *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 645(2010) ("Fraud is deemed to be discovered . . . when, in the exercise of reasonable diligence, it could have been discovered." (citations omitted)); *Patrick v. Ramsey*, No. C23-0630JLR, 2023 WL 6680913, at *4 (W.D. Wash. Oct. 12, 2023) ("Washington courts apply the discovery rule to claims where 'injured parties do not, or cannot, know they have been injured,' including claims for misrepresentation and violations of the WCPA." (quoting *Shepard v. Holmes*, 185 Wn. App. 730, 739 (2014))); *Shepard*, 185 Wn. App. at 739 ("RCW 4.16.080(4) provides that an action for relief on the ground of fraud is 'not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud.'").

"The general rule in Washington is that when a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm. The plaintiff is charged with what a reasonable inquiry would have discovered." *Green*, 136 Wn.2d at 96. "A cause of action will accrue on that date even if actual discovery did not occur until later." *Allen v. State*, 118 Wn.2d 753, 758 (1992). In other words, "[t]he action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action." *Id.*

### 3.    The parties' proposed accrual dates

Each party offers a different date for when it would have been reasonable for the Association, exercising due diligence, to discover the harm and its cause. The Association argues that it did not discover the harm until after the Seattle "heat dome" in the summer of 2021, after which it immediately began an investigation to ascertain the scope of the harm. Pl.'s MSJ 14. The Association asserts that it became "first aware that the building's IGUs were defective and needed replacement due to primary sealant failure" no earlier than December 6, 2021, when the Building Manager received the letter from RDH. *Id.*

Defendants argue that "the harm" pleaded by the Association occurred as early as July 6, 2016. Defs.' MSJ 22 (citing Am. Compl. ¶ 15); *Id.* at 25. According to Defendants, the shattered IGU constituted the harm that put the Association on inquiry notice. *Id.* at 23. Being put on inquiry notice, the Association hired RDH to investigate the broken IGU on the 35th floor as well as two shattered IGUs in 2017.[10] *Id.* Defendants assert that the Association's claims accrued no later than

---

[10] Defendant also notes that the Association had previously sued over a shattered IGU in 2012. Defs.' MSJ 23.

February 2017 when the Association received RDH's final report attributing the spontaneous shattering to a defect in the IGU. *Id.* at 25.

### 4.    Plaintiff's burden

The Association argues that the discovery of harm, its cause, and the question of diligence are all jury questions that preclude summary judgment. Pl.'s Opp'n 6-7 (citing cases). But a plaintiff's knowledge or imputed knowledge is not a question of fact if reasonable minds could reach but one conclusion. *Burns v. McClinton*, 135 Wn. App. 285, 300 (2006). "The plaintiff bears the burden of proving that the necessary facts could not be discovered in time." *Id.* (citing *Douglass v. Stanger*, 101 Wn. App. 243, 256 (2000)); *see also Clare v. Saberhagen Holdings, Inc.*, 129 Wn. App. 599, 603 (2005) ("[W]hen relying on the discovery rule, the plaintiff bears the burden of proving that the facts constituting the claim were not and could not have been discovered by due diligence.")).

### 5.    Diligent inquiry revealed a likely defect; salient information was available

The Association alleges that the IGUs supplied by Viracon contained latent defects that cause physical damage such as sealant creep and spontaneous breakage of glass. Am. Compl. ¶¶ 55, 56. The undisputed facts in the record show that the Association was on notice of the harm at least as early as July 2016, even if it did not know the exact cause of the glass shattering at that time. *See, e.g.*, Ringenberg Email Jul. 2016, Ekman Decl. Ex. 20; RDH Dep. 135, Ekman Decl. Ex. 1; Duffner Engineering Rpt. 2, Gonzales Decl. Ex. 2. To determine the cause, the Association initiated an investigation. RDH Nov. 2016 Rpt., Gonzalez Decl. Ex. 37; RDH Feb. 2017 Rpt., Ekman Decl. Ex. 27. RDH's investigation revealed a likely defect, although it did not determine

conclusively the cause of the defect. *Id.*[11] The Association asserts that it could not have known until December 6, 2021 that the shattered IGU was related to the gray sealant, and even then, the full cause and scope of the problem remained unknown. Pl.'s MSJ 16; Pl.'s Opp'n 7.

The discovery rule does not require a plaintiff to be "absolutely certain" of the cause of harm, *Holbrook, Inc. v. Link-Belt*, 103 Wn. App. 279, 292 (2000), or to have "knowledge of the existence of a legal cause of action," *Gevaart v. Metco Const., Inc.*, 111 Wn. 2d 499, 502 (1988) (citations omitted).[12] For the statute of limitations clock to begin running, the Association needed to have discovered that the spontaneous window breakage was caused by a defect in the product as opposed to a natural cause, such as a physical impact, but it was not necessary for the Association to know specifically that the gray sealant was defective. *See North Coast*, 111 Wn.2d at 321-28 (distinguishing pilot error from discovery of a mechanical defect, which had initially been ruled out as a cause of the plane crash). In *North Coast*, the Washington Supreme Court further noted its agreement with the statement of a legal writer that "[i]t would appear that the statute does not begin to run upon mere discovery that a 'product' caused an injury; the discovery provision [of the product liability statute of limitations] would be triggered upon discovery that a 'defective product' caused the injury." 111 Wn.2d at 327 quoting McGovern, *The Status of Statutes of Limitations and Statutes of Repose in Product Liability Actions: Present and Future*, 16 Forum 416, 425 (1980–81)). A plaintiff does not need to be able to conclusively prove a cause of action before the clock starts. *See Wash. State Dep't of Transp. v. Seattle Tunnel Partners*, 7 Wn. App. 2d 1038, 2019 WL 453763,

---

[11] The Association had also retained Keith Soltner and Soltner Group Architects to conduct inspections of the curtain wall between 2011 and 2013, and specifically a shattered solarium window in 2011. Ringenberg Decl. 2, ECF No. 208; Soltner Decl. 3-4, ECF No. 209. Although natural causes were ruled out, the actual cause of the breakage was deemed inconclusive. *Id.*

[12] The Court notes also that a plaintiff is not required to plead a theory of liability before conducting discovery. *Frisvold v. Pentair Filtration Sols. LLC*, No. C17-136RSL, 2017 WL 3236972, at *2 (W.D. Wash. July 31, 2017) (citing *Braden v. Tornier, Inc.*, No. C09-5529RJB, 2009 WL 3188075, at *3 (W.D. Wash. Sept. 30, 2009)).

*7 (2019) ("A smoking gun is not necessary to commence the limitation period." (quoting *Beard v. King Cnty.*, 76 Wn. App. 863, 868 (1995)).

The Association contends that it can rely on the opinions of experts and the mere observation of an isolated symptom is insufficient to start the clock. Pl.'s Opp'n 6 (citing cases indicating that an owner does not have a duty to discover defects without expert assistance). However, evidence in the record shows that, in addition to the breaking IGUs, RDH had observed the dripping sealant and "noted it as a potential issue" as early as February 2016, and information about gray sealant defects was available to RDH at the time it conducted its investigation into possible causes for the breakage in 2016. *See, e.g.*, WJE Expert Rpt. 1-2, Gonzales Decl. Ex. 1 (citing previous studies of gray PIB migration from 2012-2017); RDH Dep. 49-57, Ekman Decl. Ex. 1 (describing photographs taken February 4, 2016 and March 22, 2016 of windows in the Building with dripping PIB); Photos, Ekman Decl. Exs. 18, 19.

There is also evidence that the Association was aware of both the IGU breakages and the dripping sealant earlier. Farrell Aug. 2021 Email, Ekman Decl. Ex. 25. The Association's facility management (which included the Building Manager, Jerry Ringenberg, and Building Engineer, Tom Farrell) was certainly aware of both the IGU breakages and the dripping sealant earlier than December 2019, as the following representative evidence reveals:

- Jerry Ringenberg's Window Issues Master List, dated 12/15/2015, of window repair and replacement requirements in the Building, included items such as "caulking issues," "Filmy haze," "foggy spots," "Caulking oozes-out between the panes when the temp is hot," "cracked windows," "Shattered glass," Unit 703 "Caulk sags in spandrel in several areas and has cracked window to be replaced," Unit 1704 "Sagging caulking at operable west wall in living room," "Seals of operable windows failing on floor 25 and 29." Ringenberg's Window Issues Master List, Ekman Decl. Ex. 17;

- February 4, 2016, Building facilities representative accompanied RDH into Unit 804, where RDH photographed migrating sealant oozing from the top of the IGU.

RDH Dep. 49-53, 61-62, Ekman Decl., Ex. 18; Ringenberg Dep. 158-59, Ekman Decl. Ex. 5; Photograph, Ekman Decl. Ex. 18;

- March 22, 2016, Mr. Farrell accompanied RDH into Unit 1404, where RDH photographed an IGU displaying conspicuous primary sealant migration. RDH Dep. 52-53, Ekman Decl. Ex. 1; Farrell Dep. 54-55, Ekman Decl. Ex 2; Photograph, Ekman Decl. Ex. 19;

- Tom Farrell confirmed being aware of the IGU break on July 6, 2016 in Unit 3500, the parking level breakage on July 23, 2017; and the IGU break on December 11, 2017 in Unit 2202. Farrell Dep. 115-16, Ekman Decl. Ex 2;

- July 2016 email exchange between Jerry Ringenberg, Tom Farrell, and RDH with "history of our breakages," with Mr. Ringenberg stating: "Not sure if you have this history of our breakages, but here it is. We have the slider that failed on 7/30/2015. Would you like to check it for forensic evidence?" He included a forwarded email from Tom Farrell listing the "Glass incidents at 1521" including "10/4/2012 Unit 2703 Interior slider failed; 12/5/2014 Glass on 2nd Avenue (gunshot); 7/30/2015 Unit 2304 Interior slider failed; 7/6/2016 Unit 3500 Exterior Pane failed." Mr. Farrell added, "Also, attached is the warranty for the tempered and heat strengthened glass from Viracon." Email Jul. 2016, Ekman Decl. Ex. 20;

- August 2, 2017 Board of Directors meeting agenda included Building Manager and Building Engineer reports reporting on the window breakage in parking level 4 on July 24, 2017 with a photo being sent to RDH for review. Aug. 2017 Board Mtg. Agenda 2, Ekman Decl. Ex. 30;

- September 21, 2017 Board of Directors meeting agenda included Building Manager and Building Engineer reports reporting on "Curtainwall Work," referred to the July 24, 2017 parking level 4 curtainwall panel failure as well as noting that "Other panels are also slated for replacement due to cosmetic issues in 803 and 3800 in the next several days," and "On Monday, September 11, an exterior window failed in 2704," with a photo being sent to RDH for review. Sep. 2017 Board Mtg. Agenda 3, Ekman Decl. Ex. 31;

- Tom Farrell stated: "Instances of PIB Squeeze out (creep), and/or PIB migrating have been reported by some owners to the facility management, reportedly starting in approximately 2019." Farrell Dep. 81-82, 115-16, Ekman Decl. Ex 2;

- Email from Tom Farrell referencing an attached photo of an example of "IGU butyl drippage" stated: "This one is actually not too bad and it was changed out as it was one of the first we noted. Since then, (over the past couple years) more have been called to our attention." The email was dated August 21, 2021. Farrell Aug. 2021 Email (with attached photo), Ekman Decl. Ex. 25.

Further, in its motion, the Association itself observes that public reports were available as early as 1997 and 2002 in the glass industry indicating that "argon loss in IGUs 'will cause reduced airspace pressure and eventually a collapsed unit' that could result in 'negative consequences' like 'seal failure' or 'glass breakage'." Pl.'s MSJ 4 (quoting Gonzalez Decl. Ex. 16)); *see also* Pl.'s Reply 2 (discussing Viracon's duty to warn, the Association stated: "Multiple industry publications show that the industry understands escaping argon increases strain on IGU lites and leads to cracking and shattering. This has been discussed in the industry for nearly 30 years."). The online publications judicially noticed by the Court were equally accessible to the Association and RDH. Consequently, the Association cannot claim that if it had made a reasonable inquiry, it could not have discovered the causal relationship earlier than December 2019.

Finally, the Court observes that in April 2019, in the city of Seattle, King County instituted an action against Viracon, Quanex, and TruSeal, alleging claims related to defects in IGUs made with gray PIB-based sealant in a Seattle office building with a glass curtainwall, like the building in this case. *King County v. Viracon, Inc.*, Civil Action No. 2:19-cv-508-BJR. In the complaint filed in April 2019, King County alleged that it began noticing gray PIB sealant issues as early as October 2017, immediately realized that it could not be repaired without destroying the IGUs, and initiated a survey leading to the conclusion that the gray PIB was defective. *Id.* King County also alleged being aware of other buildings experiencing the same defective gray PIB. *Id.* It is apparent that King County's diligent inquiry revealed gray PIB sealant defects prior to April 2019. These public records show that within the community as well as within the industry, there existed information that a diligent inquiry could find regarding defects in IGUs related to gray PIB sealant.

### 6.    The Association has not met its burden

Based on the evidence in the record, the factual causal relationship between the defective IGUs and the Association's harm was discoverable earlier than the Association's alleged date of December 6, 2021, regardless whether RDH or the Association actually identified it. "The plaintiff is charged with what a reasonable inquiry would have discovered." *Green*, 136 Wn. 2d at 96 (citations omitted); *see also 1000 Virginia*, 158 Wn.2d at 581 ("A person who has notice of facts that are sufficient to put him or her upon inquiry notice is deemed to have notice of all facts that reasonable inquiry would disclose."). The Association has not met its burden under the summary judgment standard to allow this Court to find that the salient facts constituting the claim were not, and could not have been, discovered by reasonable diligence prior to December 5, 2019 (the date that bars all the Association's claims).

Accordingly, the Court denies the Association's motion to summarily dismiss Defendants' statute of limitations affirmative defense, and correspondingly, the Court grants Defendants' motion for summary judgment on all claims, finding that they are time-barred. As such, the Court declines to resolve the parties' remaining arguments, and the related motions are struck as moot.

## V.    CONCLUSION

For the foregoing reasons,

1.    Defendants' Joint Motion for Summary Judgment, ECF No. 178, is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE as time-barred;

2.    Plaintiff's Motion for Summary Adjudication, ECF No. 186, is DENIED;

3.    Defendants' Motion for Sanctions Due to Plaintiff's Intentional Spoliation of Evidence, ECF No. 175, is STRUCK AS MOOT;

4. Related motions to strike, ECF Nos. 224, 270, and 274, are STRUCK AS MOOT;

5. Related motions to exclude expert testimony, ECF Nos. 256, 258, 261, 263, 265, 268, are STRUCK AS MOOT;

6. Judgment shall be entered by separate Order.

DATED this 27th day of February 2026.

Barbara Jacobs Rothstein
United States District Judge

- 22